E. E. TAENZER & CO. v. CHICAGO, R. I. & P. RY. CO.

(Circuit Court of Appeals, Sixth Circuit.   October 3, 1911.)

No. 2,101.

1. APPEAL AND ERROR (§§ 1097, 1195*)—DECISION AS LAW OF CASE—REVERSAL.

Every question of fact or law which was before a Circuit Court of Appeals upon a writ of error, and decided by its opinion, is conclusively settled both for that court and the court below in further proceedings in the same action, and the finality of such decision is not affected by the fact that the judgment was one of reversal and direction of a new trial; but in such case the rule of conclusiveness is confined to questions actually discussed and decided by the opinion.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4358–4368, 4661–4665; Dec. Dig. §§ 1097, 1195.*

Finality of judgments and decrees for purposes of review, see notes to Brush Electric Co. v. Electric Imp. Co. of San Jose, 2 C. C. A. 379; Central Trust Co. v. Madden, 17 C. C. A. 238; Prescott & A. C. Ry. Co. v. Atchison, T. & S. F. R. Co., 28 C. C. A. 482.]

2. PLEADING (§ 8*)—PLEAS—SUFFICIENCY.

Pleadings must state facts, and not mere conclusions of law, and a plea not conforming to this requirement should be stricken out on motion.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 12–28½; Dec. Dig. § 8.*]

3. CARRIERS (§ 35*)—ACTION BY SHIPPER FOR BREACH OF CONTRACT—PLEADING.

In an action by a shipper against a railroad company to recover damages for breach of a contract, a plea held sufficient, in connection with the contract set out in plaintiff's declaration, to raise the defense that the contract was illegal, as giving plaintiff lower rates on interstate shipments than those fixed by the schedules filed and published by defendant as required by Interstate Commerce Act Feb. 4, 1887, c. 104, § 6, 24 Stat. 380, as amended by Act March 2, 1889, c. 382, § 1, 25 Stat. 855 (U. S. Comp. St. 1901, p. 3156).

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 35.*]

4. CARRIERS (§ 35*)—CONTRACT WITH SHIPPER—LEGALITY.

An agreement by an interstate railroad carrier to accept less than its established and published rate by dividing the same with a shipper which built a private track over its own lands connected with the railroad company's line violates Interstate Commerce Act Feb. 4, 1887, c. 104, § 6, 24 Stat. 380, as amended by Act March 2, 1889, c. 382, § 1, 25 Stat. 855 (U. S. Comp. St. 1901, p. 3156), and is wholly illegal and unenforceable.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 35.*]

5. CARRIERS (§ 35*)—CONTRACT WITH SHIPPER—LEGALITY.

A contract between plaintiff, a lumber company, and defendant, an interstate railroad company, by which plaintiff agreed to build a private track on its own lands connecting with defendant's line, and to ship all of its product, with a certain exception, over defendant's road, in consideration of which defendant agreed to furnish cars and to carry plaintiff's product at certain rates differing from its established and published rates, was an entire and indivisible agreement, and being illegal as in violation of Interstate Commerce Act Feb. 4, 1887, c. 104, § 6, 24 Stat. 380, as amended by Act March 2, 1889, c. 382, § 1, 25 Stat. 855 (U. S. Comp. St. 1901, p. 3156), no action can be maintained for its breach by defendant for refusing to furnish cars.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 35.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. CONTRACTS (§ 328*)—ACTION FOR BREACH—DEFENSES—ESTOPPEL.

The rule that a party who has given a reason for his refusal to perform a contract is estopped to change his ground after litigation has begun is not applicable where the contract was unlawful and in violation of a positive statute; and in such case the defaulting party is not estopped to plead its invalidity.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1571–1584; Dec. Dig. § 328.*]

In Error to the Circuit Court of the United States for the Western District of Tennessee.

Action at law by E. E. Taenzer & Co. against the Chicago, Rock Island & Pacific Railway Company. Judgment for defendant, and plaintiff brings error. Affirmed.

Caruthers Ewing (Robert E. King, on the brief), for plaintiff in error.

E. E. Wright and M. L. Bell (E. B. Peirce, on the brief), for defendant in error.

Before SEVERENS and KNAPPEN, Circuit Judges, and EVANS, District Judge.

KNAPPEN, Circuit Judge. This suit grows out of a contract made November 22, 1900, between the Choctaw, Oklahoma & Gulf Railroad Company and the Gifford-Frisbie Lumber Company, which latter company owned a large tract of land in Cross county, Ark., about eight miles north of Round Pond, a station on said railroad. By this contract the lumber company agreed to build a railroad from a point near Great Bend, on the St. Francis river, where the lumber company's mill was located, to the railroad company's right of way at Round Pond. The railroad company agreed to give the lumber company a connection with the former's railroad, and to construct at its own cost that portion of the railroad which should be on its own right of way and which it should own. The lumber company further agreed to construct "at its own cost or expense, and on its own right of way, a switch or side track near the place of intersection of said railroads, for the placing of cars." The railroad company was to give the lumber company certain assistance in the building of the road by way of selling a portion of the materials at cost and furnishing the rails and fastenings on credit, to be secured by mortgage on the lumber company's road, on which mortgage was to be applied the lumber company's proportion of the through freights, under a division thereof hereafter referred to. The lumber company bound itself to ship over the railroad company's line during a period of ten years all of its lumber and the traffic originating on the lumber company's road, except such as the latter might desire to ship to and from Memphis by way of the St. Francis and Mississippi rivers, with provision, in case of default, for liquidated damages, as well as immediate maturity of the indebtedness for rails and fastenings.

The contract provided a system of rate making and freight division during the 10-year period, the material portions of which are these:

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

That on lumber from the mills to Hopefield and Memphis the through rate should be 5 cents per hundredweight; on cotton to Hopefield and Memphis the same rate as from Round Pond, or the connecting point of the two lines; on merchandise to and from Memphis the same rate as between Memphis and equally distant points on the railroad company's line; on grain and grain products from stations on the railroad company's lines to points on the lumber company's lines, the same rates as to Memphis from the same stations on the railroad company's lines. In the matter of divisions the lumber company was to receive on all shipments of lumber for delivery at Hopefield 2 cents per hundredweight; on lumber to western stations 2½ cents per hundredweight; on cotton to Hopefield and Memphis 50 per cent. of the through rate, after deducting the bridge and delivery charges; on merchandise to and from Memphis 50 per cent. of the through rate after deducting bridge tolls at Memphis; on grain and grain products from stations on the railroad company's line in the west 3 cents per hundredweight. The lumber company's acceptance of this basis for making of rates and divisions was declared to be upon the understanding that the agreement was for an exclusive interchange of business with the railroad company, except such traffic as the lumber company might desire to handle on the St. Francis and Mississippi rivers to Memphis or beyond.

Plaintiff succeeded to the rights of the Gifford-Frisbie Company, and took its place under the contract for the construction of the railroad. The railroad was never incorporated until after the commencement of this suit, but was a part of the lumber company's property, and used entirely in the business of the lumber company as a mere means of getting its output to the railroad company's tracks. The defendant later succeeded to the rights of the Choctaw, Oklahoma & Gulf Railroad Company.

This suit was brought to recover damages for failure to furnish and place upon the side track referred to an adequate supply of cars for the use of the plaintiff in hauling its products from the mill at Great Bend and along the line of its road to the railroad station at Round Pond for shipment over the defendant's road. The declaration may perhaps properly be construed as charging also a failure to furnish cars for the receipt of logs and lumber delivered along and upon defendant's right of way. Upon the trial in the Circuit Court verdict was directed for defendant upon the grounds that the defendant railroad was a common carrier; that, in the absence of special contract, the defendant company, as a common carrier, owed no duty to the plaintiff's road to supply the latter with rolling stock for the purpose of hauling freight over its own line; that the contract between the Choctaw, Oklahoma & Gulf Railroad Company and the Gifford-Frisbie Company did not require the railroad company to furnish cars to the lumber company; that the defendant's only duty was to receive for transportation logs and lumber delivered at Round Pond on the right of way of the defendant company; and that there was no proof of refusal or failure by the defendant to receive logs or lumber delivered upon its right of way. This court held that the plaintiff's railroad

was not a common carrier; that the contract was thus not one between connecting common carriers, but between the railroad company as a carrier and the lumber company as a shipper, and that the former was by implication bound, on reasonable notice, to furnish cars on the side track in reasonably necessary numbers for the use of the lumber company in conducting its business. The judgment of the Circuit Court was accordingly reversed and new trial ordered. Taenzer v. Chicago, R. I. & P. Ry. Co., 170 Fed. 240, 95 C. C. A. 436.

Thereupon the defendant, by leave of the Circuit Court, filed therein four additional pleas to the declaration, as follows:

"First. And, for further plea in its behalf, the defendant avers that any special outstanding contract or agreement entered into between the plaintiff and defendant other and different from the common-law obligation imposed upon defendant as a common carrier of passengers and freight is illegal and void, in that it is contrary to the common law, the law of the United States, and the statutes of the state of Arkansas made and provided.

"And this it is ready to verify.

"Second. And, for further pleas in its behalf, the defendant avers that the contract and agreement, as set forth and construed in the plaintiff's declaration, is illegal and void as being contrary to section 6 of an act of the Congress of the United States, entitled, 'An act to regulate commerce,' approved February 4, 1887, as amended by an act approved March 2, 1889, and further amended by an act approved March 10, 1891, and still further amended by an act approved February 8, 1897, in that the plaintiff's declaration avers that the plaintiff is not a common carrier of freight or passengers, and under the act of Congress it is illegal and contrary to law for the plaintiff and defendant to enter into any contract or agreement concerning the rate to be charged for the transportation of either freight or passengers.

"Third. And for further pleas in its behalf the defendant avers that the contract on which the plaintiff seeks to recover, as set forth in its declaration and as therein construed, is illegal and void, being in violation of an act of Congress of the United States entitled, 'An act to regulate commerce,' approved February 4, 1887, as amended by an act approved March 2, 1889, and as further amended by an act approved March 10, 1891, and as further amended by an act approved February 8, 1897, in this: The defendant avers that it is a common carrier, engaged in the transportation of passengers and property wholly by railroad from one state of the United States to another state, to wit, from the state of Arkansas to the state of Tennessee, and as such is subject to the provisions of the act aforesaid; that in compliance with its duty in that behalf it duly establishes and publishes and files its schedule of rates, fares, and charges for the transportation of passengers and property between the states aforesaid in the manner as therein provided; that it has at all times so established, published, and filed its schedule of rates and charges for the transportation of property between points in the state of Arkansas and the state of Tennessee and other points in the several states through which its line runs, and particularly from Round Pond, Ark., to the city of Memphis; that such rates, fares, and charges so established, published, and declared were and are the lawful rates for the transportation of passengers and property between Round Pond and the city of Memphis aforesaid; that any division of said rates with any other person or party other than a common carrier is illegal and void; that the terms of the agreement set forth in the plaintiff's declaration taken in connection with the statements and allegations in said declaration contained, and as construed by said statements and said declaration, particularly taken in connection with the allegation that said plaintiff is not a common carrier, require this defendant to divide its lawful, established, published, and filed schedule of rates and charges for the transportation of the property in plaintiff's declaration described, with the plaintiff not as a common carrier, but as a shipper.

"And this the defendant is ready to verify.

"Fourth. And for a further plea in its behalf this defendant says that the contract and agreement as set forth and construed in said plaintiff's declaration is illegal and void, being in violation of section 2 of an act entitled 'An act to regulate commerce,' approved February 4, 1887, as amended by an act approved March 2, 1889, and as further amended by an act approved March 10, 1891, and as further amended by an act approved February 8, 1897, in this: That the terms and conditions of said contract as in said declaration alleged and stated requires this defendant by means of a special rebate, drawback, or otherwise, to wit, a division of its regularly and lawfully established, published and filed schedule of rates for the transportation of property, to demand, collect, and receive from the plaintiff a less compensation for a service rendered the plaintiff as a shipper of such property and the transportation thereof than it charges, demands, collects, and receives from any other person or persons for doing a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar conditions and circumstances, thus granting plaintiff as a shipper an undue and unreasonable preference.

"And this the defendant is ready to verify."

The plaintiff moved to strike out the additional pleas upon the grounds, first, that conclusions of law rather than defensive facts were stated therein; second (broadly stated), that the contract is not shown to be illegal or to violate the interstate commerce law; and, third, that illegality in the contract would not relieve defendant from the performance of its common-law obligations to furnish cars to the shipper. The Circuit Court refused the motion to strike out the additional pleas, and the plaintiff, declining to join issue thereon, or make further response thereto, entered an order and judgment taking the pleas as confessed and dismissing plaintiff's suit. The assignment of errors brings up for review only the correctness of this order and judgment.

We are met at the threshold by plaintiff's contention that this court on the former review construed the contract as binding the defendant, on reasonable notice, to furnish cars on the sidetrack in necessary numbers for the use of the lumber company in conducting its business; that this court thus sustained the legality of the contract; that this decision thus became the law of the case, and is thus decisive of the defense raised by the additional pleas.

[1] The rule is too well settled to require more than the merest reference to authority that every question of fact or law which was before a Circuit Court of Appeals upon a writ of error, and decided by its opinion, is conclusively settled both for such court and the court below in further proceedings in the same action, and that the finality of such decision as respects questions actually decided is not affected by the fact that the judgment was one of reversal and direction of new trial. Messinger v. Anderson (C. C. A. 6) 171 Fed. 785, 790, 96 C. C. A. 445. But, as applied to judgments of reversal where new trials are ordered, the rule of conclusiveness is confined to questions actually decided. In Mutual Life Ins. Co. v. Hill, 193 U. S. 551, 553, 24 Sup. Ct. 538, 48 L. Ed. 788, the following language was used with reference to a similar contention there:

"That decision was based upon the averments of the pleadings, and these pleadings were amended after the judgment was reversed and the case returned to the trial court. Clearly the contention of the plaintiff is not sustainable. When a case is presented to an appellate court, it is not obliged

to consider and decide all the questions then suggested, or which may be supposed likely to arise in the further progress of the litigation. If it finds that in one respect an error has been committed so substantial as to require a reversal of the judgment, it may order a reversal without entering into any inquiry or determination of other questions. While undoubtedly an affirmance of a judgment is to be considered an adjudication by the appellate court that none of the claims of error are well founded—even though all are not specifically referred to in the opinion—yet no such conclusion follows in case of a reversal. It is impossible to foretell what shape the second trial may take or what questions may then be presented. Hence the rule is that a judgment of reversal is not necessarily an adjudication by the appellate court of any other than the questions in terms discussed and decided."

This language is pertinent to, and decisive of, the question before us. Upon the former review the defendant's contention was that the contract should be construed as one between connecting common carriers. The legality of the contract, as one between a common carrier and a shipper, was not discussed or presented. It was not until after this court had held the relation to be that of carrier and shipper that the pleas in question were filed. We think it clear that such further defense is not precluded by the former decision of this court.

[2] As to the legal sufficiency of the pleas: The rule is well settled that pleadings must state facts, and not mere conclusions of law, and that a plea not conforming to this requirement should be stricken out. Alabama v. Burr, 115 U. S. 413, 426, 6 Sup. Ct. 81, 29 L. Ed. 435. The provisions of the interstate commerce act at which the pleas are aimed are as follows:

"Sec. 2. That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."

"Sec. 6. That every common carrier subject to the provisions of this act shall print and keep open to public inspection schedules showing the rates and fares and charges for the transportation of passengers and property which any such common carrier has established and which are in force at the time upon its route. The schedules printed as aforesaid by any such common carrier shall plainly state the places upon its railroad between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately the terminal charges and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates and fares and charges. Such schedules shall be plainly printed in large type, and copies for the use of the public shall be posted in two public and conspicuous places, in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation in such form that they shall be accessible to the public and can be conveniently inspected. * * * And when any such common carrier shall have established and published its rates, fares, and charges in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates, fares, and charges as may at the time be in force."

[3] It is urged as against the sufficiency of the statement of facts contained in the pleas that the rates fixed by the schedules are not so stated that the court 'may determine whether such rates are different from those fixed by the contract; that the times when the schedules were published is not shown; that the facts are not sufficiently stated to enable the court to determine that the rates provided by the contract are less than charged others for like and contemporaneous services under substantially the same conditions and circumstances. The contract in question is, however, set out in full in the plaintiff's declaration, and was thus properly before the court for consideration in connection with the pleas. Whatever may be said of the sufficiency of the first, second, and fourth pleas, it seems clear that the allegations of the third plea, taken in connection with the contract, definitely apprise the plaintiff of the defendant's contention that, at the time of the making of the contract and during its continuance defendant's rates, fares and charges were established and published in compliance with the provisions of section 6 of the act; and that by the agreement in question the defendant contracted to receive from the plaintiff a less compensation for the transportation of property than specified in the published schedules of rates, fares, and charges in force at the time and times in question. The third plea expressly asserts not only that defendant "duly establishes, publishes and files its schedule of rates, fares, and charges for the transportation of passengers and property between the states aforesaid in the manner as therein provided," but also that: "It has at all times so established, published, and filed its schedules of rates and charges for the transportation of property between points in the state of Arkansas and the state of Tennessee, and other points in the several states through which its line runs, and particularly from Round Pond, Ark., to the city of Memphis." It also asserts that:

"The terms of the agreement set forth in the plaintiff's declaration taken in connection with the statements and allegations in said declaration contained, and as construed by said statements and said declaration, particularly taken in connection with the allegation that said plaintiff is not a common carrier, require this defendant to divide its lawful, established, published, and filed schedule of rates and charges for the transportation of the property in plaintiff's declaration described with the plaintiff not as a common carrier, but as a shipper."

[4] That an agreement whereby a carrier accepts from the shipper less than the established and published rate violates the interstate commerce act and is wholly illegal is clear. Gulf, Colorado, etc., Ry. Co. v. Hefley, 158 U. S. 98, 15 Sup. Ct. 802, 39 L. Ed. 910; Texas & Pacific Ry. Co. v. Mugg, 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011; Armour Packing Co. v. United States, 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681; New Haven R. R. Co. v. Interstate Commerce Commission, 200 U. S. 361, 26 Sup. Ct. 272, 50 L. Ed. 515; 1 Page on Contracts, p. 777.

In New Haven Railway Co. v. Interstate Commerce Commission it was held that the interstate commerce act was enacted to secure equality of rates and to destroy favoritism, and that its prohibitions against directly or indirectly charging less than published rates are all-em-

bracing and applicable to every method by which the forbidden results could be brought about. In Armour Packing Co. v. United States it was held that the fact that a contract was at a published rate when made does not legalize it after the carrier had advanced the published rate. It is equally illegal for an interstate carrier to contract for a division of freights with a shipper maintaining a spur track appurtenant to his operations. Chicago & Al. R. R. Co. v. United States (C. C. A. 7) 156 Fed. 558, 84 C. C. A. 324, 26 L. R. A. (N. S.) 551. The contract being against the public policy of the United States, as expressedly declared by these statutes, the fact that the shipper did not intend to violate the law is immaterial. Railroad v. Interstate Commerce Commission, 200 U. S. 361, 398, 26 Sup. Ct. 272, 50 L. Ed. 515; Railway Co. v. Mugg, 202 U. S. 242, 245, 26 Sup. Ct. 628, 50 L. Ed. 1011. The rule is fundamental that an illegal contract will not be enforced at the suit of either party. The law leaves each party where it finds it.

As said in McMullen v. Hoffman, 174 U. S. at page 654, 19 Sup. Ct. at page 845, 43 L. Ed. 1117:

"The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights directly springing from such contract. 'Potior est conditio defendentis.'"

[5] But plaintiff earnestly contends that, even conceding the illegality of the agreement for division of freight rates, the contract with reference to transporting plaintiff's freight was not thereby rendered illegal. The argument is that the carrier might still enforce its established and published rate, that the agreement for the reduced rates was independent and collateral, and the real consideration for the transportation was not the freight which plaintiff agreed to pay, but that which the defendant was entitled to collect. But this action is based upon a breach of the contract obligation, and no action can be maintained on it, provided the agreement is entire and indivisible. As stated in 1 Page on Contracts, at page 777:

"If any part of an entire and indivisible consideration is illegal, all the promises based thereon are unenforceable, even though the residue of such consideration is legal."

In the case before us the consideration for the railroad's contract embraced the building of the spur and plaintiff's agreement to transport all freight over the defendant's road. The consideration for plaintiff's contract embraced, in addition to the reduced freight rates, the defendant's assistance in building the spur and the agreement to furnish cars for use thereon. That the railroad company would presumably have entered into the contract without the provision for division of freight rates is inferable, but there is no reason to infer that the lumber company would have done so. We think the provision for division of freight rates is part of an entire and indivisible consideration for the contract of the railroad company whose default is here complained of. The fact that it does not affirmatively appear

that plaintiff would have refused to pay the lawfully established freight rate, if demanded by defendant, is thus immaterial.

[6] The declaration alleges, however, that the only reason assigned by defendant and its predecessor in interest for failing to furnish sufficient cars was that the defendant did not have sufficient and adequate cars, and the rule is invoked that, where a party gives a reason for his conduct touching anything involved in the controversy, he is estopped, after litigation is begun, from changing his ground and putting his conduct on another and different ground. The general rule referred to is well supported. Snyder v. Mystic Circle, 122 Tenn. 248, 122 S. W. 981; Ohio & Mississippi Ry. Co. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693; Davis v. Wakelee, 156 U. S. 680, 15 Sup. Ct. 555, 39 L. Ed. 578; Cheek v. Merchants' National Bank, 56 Tenn. 490; Oakland Sugar Mill Co. v. Fred W. Wolf Co. (C. C. A. 6), 118 Fed. 239, 248, 55 C. C. A. 93. In Snyder v. Mystic Circle it was said:

"Where a party gives a reason for his conduct and decision touching anything involved in controversy, he is estopped, after litigation is begun, from changing his ground, and putting his conduct on another and different ground."

In Ohio & Mississippi Ry. Co. v. McCarthy, the railroad company had contracted to transport cattle from East St. Louis to Philadelphia. The cattle arrived at Parkersburg, W. Va., on Sunday, and the only reason given by the railway company for not forwarding them at once was that there was a scarcity of cars. It appeared that the law of West Virginia forbade the transportation on Sunday. Justice Swayne said:

"The question made by the company upon the Sunday law of West Virginia does not, in our view, arise in this case. We have already shown that the defendant proved upon the trial that it was impossible to forward the cattle on Sunday for want of cars. And it is fairly to be presumed that no other reason was given for the refusal at that time. It does not appear that anything was then said as to the illegality of such a shipment on the Sabbath. This point was an afterthought, suggested by the pressure and exigencies of the case. Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law [citing authorities]."

In our opinion, however, the rule stated in the authorities cited does not apply to the case of a contract in contravention of the public policy of the United States as expressed by its positive statutes. In such case it is the duty of the court to declare the illegality of the contract, even if not pleaded. The case of Railway Company v. McCarthy is the strongest case presented in support of the defense we are considering. In that case, however, there was no contract for shipment on Sunday, nor even a contract that the shipment should be made over the particular railroad in question, which was affected by the West Virginia Sunday law. Moreover, it would seem that the remark as to the Sunday law is more or less obiter, in that the court had already held that the inability of the Baltimore Company to forward the shipment on Sunday by reason of lack of cars was not a defense.

It is suggested that defendant is charged by the declaration with a breach of the common-law obligation, independently of contract, to furnish cars to shippers. So far as this suggestion relates to the furnishing of cars for use on plaintiff's road, and off defendant's right of way, it is enough to say that no authorities are cited, and we know of none, which create such obligation. Assuming that the declaration is intended to charge a breach of the common-law obligation by failing to furnish cars for use on defendant's right of way, we think the declaration cannot be construed as alleging the obligation to so furnish cars except upon the terms provided in the contract as to freight rates and divisions thereof.

We have not overlooked the consideration that the conclusion reached results in great hardship to the plaintiff, whose business has apparently been established upon the strength of the contract, and, so far as shown by the record, in ignorance of its illegality. But, however strongly we may sympathize with plaintiff, we cannot allow such consideration to overcome our view of the legal rights of the parties. The contract being shown to be illegal, no course is left but to so declare it. It is true that evidence has not been offered in support of the plea which sets up this illegality, but that plainly is not the fault of the defendant, but results from the fact that the plaintiff, doubtless properly, refused to join issue upon the pleas and enable their truth or falsity to be shown by the proofs.

It results from these views that the judgment of the Circuit Court should be affirmed.